UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KIRK TUEY,

NO. CIV. S-07-2442 LKK/GGH

     Plaintiff,

  v.

O R D E R

MAMMOTH MOUNTAIN SKI AREA,
INTRAWEST CORPORATION,
STARWOOD CAPITAL GROUP
GLOBAL, LLC,

     Defendants.

_____/

     Plaintiff, Kirk Tuey, brought suit against defendants, Mammoth Mountain Ski Area ("Mammoth"), Intrawest Corporation, and Starwood Capital Group Global LLC, for injuries he sustained while skiing at Mammoth's ski park. Pending before the court is Mammoth's motion for summary judgment on the affirmative defense of assumption of risk and motion to bifurcate.

////

////

////

# I. Facts[1]

On February 17, 2006, plaintiff and his co-worker Rahul Madhusudanan went skiing at Mammoth's ski park, where he sustained injuries due to a fall. Plaintiff was an advanced skier as of that date. Plaintiff has no memory of the events of the date of the accident, and there are no known witnesses to his fall.[2]

On the day of the accident, the weather was very foggy. There was diminished clarity because of the flat light visibility conditions. Plaintiff and Mr. Madhusudanan purchased lift tickets and at about 10:20 am, boarded Thunderbound Express Chairlift. The chairlift takes skiers to the top of Unbound Main Terrain Park ("UMTP") and passes over the rest of the park as well. UMTP is a ski resort area that contains natural and man-made features such as jumps, rails, boxes and half pipes. On the date of the accident, Mammoth owned, operated and maintained UMTP and the surrounding freestyle terrain area.

Mr. Madhusudanan recalled that on the chair lift ride, plaintiff and he were looking at the trail map to chart their path for the day.[3] While riding in the chairlift, Mr. Madhusudanan did

---

[1]The facts are undisputed unless otherwise noted. Defendant objects to and moves to strike several items of evidence offered by the plaintiff in his opposition to defendant's motion. Almost all of the challenged evidence is unnecessary to the resolution of the motion. To the extent that it is relevant, those objections are OVERRULED and the motion to strike are DENIED.

[2]Because plaintiff does not remember the events of that day, both parties have relied on the testimony of Mr. Madhusudanan.

[3]Although plaintiff does not object to the defendant's reliance on the deposition testimony of Mr. Hadhusudanan, it

not observe anyone in the half pipe below, which is also known as Super Pipe, nor did he observe any flagging along the decks of the half pipe. After exiting the chairlift, plaintiff and Mr. Madhusudanan went through the entrance to the UMTP. There were three warning signs posted at the UMTP's entrance. The signs stated that natural and man-made terrain features were present in the park. Specifically, one sign stated,

> Freestyle Terrain may contain jumps, hits, ramps, embankments, fun boxes, jibs, rails, half pipes, quarter pipes, snowcross, freestyle bump terrain and other constructed or natural terrain features. PRIOR to using Freestyle Terrain, you are responsible for familiarizing yourself with Freestyle Terrain and obeying all instructions, warnings and signs. Freestyle skills require maintaining control on the ground, and in the air.

Decl. of Oren Tanzer in Support of Defendant's Motion for Summary Judgment ("Tanzer Decl."), Ex. A (Incident Photo 1.3). Neither plaintiff nor Mr. Madhusudanan stopped to read any signs at the top of the UMTP run. Mr. Madhusudanan understood the signs to mean that some of the features in the park were man-made and that a skier would need specific skills to ski those features or part of the park.

---

appears to the court that some of his testimony raises hearsay concerns. Upon careful review of the testimony, none of the evidence relied on by the court includes hearsay statements. Mr. Madhusudanan's only testimony that implicates his conversations with the plaintiff describe his own state of mind as a result of his conversation with plaintiff or the effect that conversation had on him. See Penwarden Decl. Ex. F at 30:16-34:6, 40:2-4; 41:20-23. Such statements are not hearsay. See, e.g., United States v. Payne, 944 F.2d 1458, 1472 (9th Cir. 1991), cert. denied 503 U.S. 975 (1992). Mr. Madhusudanan's testimony about his own prior statements is not considered hearsay, per Federal Rule of Evidence 801(d)(1).

Mr. Madhusudanan has testified that he and plaintiff intended to get to an adjacent ski trail in the ski park (the Broadway run) and, in order to do so, they cut through the UMTP as a shortcut because "it was the fastest way down." Pl.'s SUF ¶ 4. They planned to ski down through the terrain park and cut across to their left in the direction of the Broadway run after the tree line on their left ended. Mr. Madhusudanan thought that this would lead them to the Broadway chairlift so that they could take the Broadway chairlift to go higher up the mountain. Mr. Madhusudanan later testified that he had seen what he thought was a clear path after the tree line on the left side. He testified that he thought he had seen this clear path as he rode up the chairlift.

While skiing through UMTP, plaintiff and Mr. Madhusudanan skied past some man-made features, which Mr. Madhusudanan knew would be present in the UMTP. Plaintiff and Mr. Madhusudanan did not use any of the jumps or other features of UMTP as they skied down. Mr. Madhusudanan estimates that plaintiff was going 5-10 miles per hour as he skied down through the terrain park. Because Mr. Madhusudanan believed there was a clear path to his left to the Broadway ski run after he cleared the tree line on his left, both he and plaintiff were waiting for the trees to clear. Mr. Madhusudanan was following plaintiff at a distance of about 15-20 feet behind. They skied down about 1000 feet from the top of UMTP to the end of the tree line where the entrance to the half pipe was located.

When he took the path down from the top of the mountain to the

end of the tree line, Mr. Madhusudanan believed that the path was clear and unobstructed. He did not see a half pipe, and he did not see any obstructions blocking his path towards the left to Broadway such as rope or flags marking the area. Mr. Madhusudanan testified in his deposition that as he skied toward the left coming down the UMTP trail, the Super Pipe depression was not visible at all, although defendant contends that Mr. Madhusudanan's testimony was vague as to the location from which the Super Pipe was not visible. Mr Madhusudanan saw the half pipe drop off for the first time after he had already skied off the edge of it and was in the air over the drop-off. Mr. Madhusudanan was a beginner skier and testified that he would not have skied into the Super Pipe drop-off had he known it was there, as he sought to avoid those features. Mr. Madhusudanan did not see any sign notifying skiers of the half pipe entrance within 50 yards of the location where he skied into it.

The half-pipe is approximately 450-feet long and 60-feet wide with the sidewalls' heights at approximately 15 feet. Oren Tanzer, Mammoth's terrain park manager and the designer of the half pipe, has depicted a 51-foot gap at the half-pipe's entrance with a rope line on either side of the gap, but not covering the gap itself. Defendant has tendered photographs of the half-pipe which depict signs, bamboo poles, rope, and flags around the half-pipe, see Tanzer Decl. Exh. A, although Mr. Madhusudanan does not recall seeing any of these at the time of the incident.

Mr. Madhusudanan recalls falling about 8 feet down into the half pipe. He did not suffer serious injury as a result of the

fall. Mr. Madhusudanan did not see plaintiff fall into the half pipe. Plaintiff fell into the half pipe first as he was skiing ahead of Mr. Madhusudanan on that path. After being launched into the air from the edge of the half-pipe, plaintiff fell approximately 15-18 feet. After plaintiff's fall, he was found lying face-down and unconscious with his head twitching. Plaintiff was wearing a helmet at the time of the accident.

It is alleged in plaintiff's complaint that he suffered severe traumatic brain injury including permanent brain damage. Plaintiff seeks damages for past and future medical bills, hospital expenses, and loss of earnings.

## II. Standards

### A. Standard for Summary Judgment Under Federal Rule of Civil Procedure 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ.

7

P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); see also In re Citric Acid Litigation, 191 F.3d 1090, 1093 (9th Cir. 1999). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

**B.    Standard for Bifurcation Under Federal Rule of Civil Procedure 42(b)**

Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1021

1  (9th Cir. 2004). Federal Rule of Civil Procedure 42(b) provides in

2  pertinent part:

> The court, in furtherance of convenience or to avoid
> prejudice, or when separate trials will be conducive to
> expedition and economy, may order a separate trial of
> any claim, cross-claim, counterclaim, or third-party
> claim, or of any separate issue. . . .

6  The issue of whether to bifurcate is guided by consideration

7  of several factors: (1) whether separation of the issues for trial

8  will expedite disposition of the action; (2) whether such

9  separation will conserve trial time and other judicial resources;

10  (3) whether such separation will avoid prejudice; and (4) whether

11  the issues are essentially independent of each other so that there

12  will be no need to duplicate the presentation of significant areas

13  of the evidence in the separated proceedings. <u>Green v. Baca</u>, 226

14  F.R.D. 624, 630 (C.D. Cal. 2005); <u>McKellar v. Clark Equip. Co.</u>, 101

15  F.R.D. 93, 94 (D. Me. 1984). "Absent some experience demonstrating

16  the worth of bifurcation, 'separation of issues for trial is not

17  to be routinely ordered.'" <u>Hamm v.American Home Products Corp.</u>, 888

18  F. Supp. 1037, 1039 (E.D. Cal. 1995)(citing Advisory Committee

19  Notes to the 1966 Amendment to Fed. R. Civ. P. 42(b)).

## III. Analysis

21  The defendant moves for summary judgment on its affirmative

22  defense that plaintiff's claim is barred according to the doctrine

23  of primary assumption of risk. As explained herein, the court

24  denies the motion. Also pending before the court is defendant's

25  motion to bifurcate, which the court denies without prejudice.

26  ////

**A.    Motion for Summary Judgment**

    **1.    Doctrine of Assumption of Risk**

In <u>Knight v. Jewett</u>, 3 Cal. 4th 296, 315 (1992), the California Supreme Court described the principles of assumption of risk. In order to know if a plaintiff assumed the risk of a particular activity, the court must determine if the defendant owed a duty to the plaintiff. <u>Knight</u>, 3 Cal. 4th at 313. The question of whether or not there was a duty is a legal determination for the court to make, rather than the jury. <u>Id.</u> In the sports context, the determination of the existence of a defendant's duty of care and the scope thereof is a "legal question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity." <u>Id.</u>

The <u>Knight</u> court held that some dangers are inherent and integral to participation in the sport itself and that the court must take these integral dangers into account when determining whether there is a duty of care.

> As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person. In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant.

<u>Id.</u> at 315 (internal citations omitted). As such, a defendant owes no duty to eliminate or protect plaintiffs from the risk of those harms arising from these inherent dangers of a sport. <u>Id.</u> If plaintiff were to seek recovery for injuries arising from those

inherent dangers, "the doctrine of assumption of risk continues to operate as a complete bar to the plaintiff's recovery." Id.

The Knight court contrasted such inherent dangers with those that are clearly not inherent in the sport, such as dangers posed by a ski resort's negligence. Id. at 315-16. The defendant does have an affirmative legal duty to eliminate or protect plaintiffs from the latter type of risks. Id.

The relationship between the parties is another key factor in determining whether or not a defendant owes a duty to the plaintiff for the dangers encountered in a sport. A defendant who "is an organizer of the activity or someone who has provided or maintained the facilities and equipment used" will have a duty to sports participants to not increase the inherent dangers of a sport. Luna v. Vela, 169 Cal. App. 4th 102, 109 (2008), citing Morgan v. Fuji Country USA, Inc., 34 Cal. App.4th 127 (1995). In contrast, no such duty exists among coparticipants of a sport. Id.; see also Kahn v. East Side Union High School Dist., 31 Cal.4th 990, 1003 (2003) (a baseball stadium owner may owe a duty to spectators in the stands to use a certain glass shield to protect against errant balls whereas a pitcher would not owe such a duty).

Because the assumption of risk defense implicates the defendant's duty to the plaintiff, it is generally a question of law for the court. Knight, 3 Cal. 4th at 313. To determine if there was a duty, the court considers the nature of the activity or sport

////

////

and the parties' relationship.[4] Id.; see also Shin v. Ahn, 42 Cal. 4th 482, 488 (2007).

### 2. Nature of the Activity

It appears from the briefing by the parties and the court's own inquiry that no California court or court applying California law has addressed the question of how the assumption of risk analysis applies in cases where the plaintiff has skied in a terrain park. Nevertheless, the rule that has emerged in California for skiing generally and for other sports leads the court to conclude that the defendant has not shown that, as a matter of law, the hazards allegedly encountered by plaintiff are of the type for which plaintiff assumed the risk.

The California courts have consistently applied the rule that, when injuries arising from skiing are at issue, the defendant is held not to have increased the risk to the plaintiff so as to create a heightened duty of care if the man-made structure or object erected or maintained by the defendant is necessary or fundamental to the sport. See, e.g., Connelly v. Mammoth Mountain Ski Area, 39 Cal. App. 4th 8, 12-14 (1995). Moreover, the courts have also consistently held that a defendant does not have a heightened duty to skiers upon erecting or maintaining any manmade structure in the ski area, so long as the structure is obvious and visible or the skier otherwise has notice of it. See, e.g., Solis

---

[4]Here, defendant does not dispute that its relationship to plaintiff was the type that might give rise to a heightened duty of care, as defendant was the operator of the ski area in question. See generally Def.'s Mot. for Summ. J.

v. Kirkwood Resort Co., 94 Cal. App. 4th 354 (2001). As the court summarized in Lackner v. North, 135 Cal. App. 4th 1188, 1202 (2006),

> The risks inherent in snow skiing have been well catalogued and recognized by the courts. Those risks include injuries from variations in terrain, surface or subsurface snow or ice conditions, moguls, bare spots, rocks, trees, and other forms of natural growth or debris. They also include collisions with other skiers, ski lift towers, and other properly marked or plainly visible objects and equipment.

Preliminarily, it appears to this court the creation by the defendant of the terrain park is not analogous to those cases in which the California courts have held that the defendant did not assume a heightened duty, to skiers in plaintiff's condition, although defendant had made alterations to the terrain. In those cases, the alterations made to the terrain were erection and maintenance of features necessary to the sport of skiing. For example, in Connelly, 39 Cal. App. 4th at 12-14, the court held that although a ski lift tower may present a hazard to an errant skier, erection of such tower does not ordinarily increase the risks inherent in skiing and thereby cause the resort to acquire a heightened duty of care toward a skier. See also Randall v. Mammoth Mountain Ski Area, 63 F.Supp.2d 1251, 1255 (E.D. Cal. 1999) (applying California law and holding that "grooming or snowmaking activities that mimic normal natural effects would not give rise to a duty even if performed negligently, so as, for example, to create bare or icy patches"); cf. O'Donoghue v. Bear Mountain Ski Resort, 30 Cal. App. 4th 188, 191-93 (1994)(skier assumed the risk

of unintentionally skiing into ravine bordering tree-lined ski run; defendant had not assumed a heightened duty because it took no action nor caused conditions that forced the skier into the ravine and "it is an inherent risk of skiing that a skier might encounter hazardous natural forest obstacles, such as rough terrain, trees, rocks and ravines if he or she enters the natural forest").

Here, defendant's creation of the terrain park is not analogous to the inherent features of skiing that a skier would expect to encounter, such as a ski lift tower or a snowblower. See Connelly, 39 Cal. App. 4th at 12-14. Defendant contends that the half-pipe that allegedly was the source of plaintiff's injuries is a natural feature in a terrain park. In this sense, defendant urges to the court to find that plaintiff was engaged in "terrain park skiing" and therefore assumed the risks of that specialized sport. This perspective, however, does not appear to comport with California law.

For example, in Solis, 94 Cal. App. 4th 354, the defendant ski resort altered a portion of a previously ordinary ski run to form a racing area that included jumps. The plaintiff entered the racing area and fell down when he encountered the jumps. Id. at 358. The court reversed the grant of summary judgment for the defendant based on the assumption of risk defense. Id. at 366. It held that in order to succeed on a motion for summary judgment, the defendant must demonstrate that under no hypothesis can plaintiff prove that defendant did increase the inherent risks of skiing. Id.

The court held that the defendant had not met this standard.

Id. It observed that the plaintiff had tendered evidence that he did not intend to enter the racing area, but simply to ski down the mountain. Id. As such, the court could not conclude as a matter of law that the plaintiff had in fact assumed the risks of skiing in the racing area. Id. Moreover, because there was conflicting evidence as to whether the racing area was marked, the court could not conclude that the plaintiff assumed the risk of skiing in the racing area by virtue of the adequacy of defendant's notice. Id. The court held that "when a resort turns part of a previously ordinary run into a significantly more dangerous racing area, it has a duty to warn its patrons." Id. at 366. Although defendant had tendered evidence in that case that it did warn patrons of the hazard by erecting bamboo poles along it, the adequacy of the warning was disputed. Id. at 366-67. Consequently, the court held that defendant's motion for summary judgment on the issue of assumption of risk should have been denied. Id.

This holding is in accord with other California courts that have similarly emphasized that a defendant who erects a structure in a skiing area may not have assumed a heightened duty of care to the plaintiff if it can show that it gave notice of the structure that was adequate as a matter of law. See, e.g., Souza v. Squaw Valley Ski Corp., 138 Cal. App. 4th 262, 268 (2006) (no heightened duty to skier who ran into the nozzle of a ski hydrant, because the hydrant was large and plainly visible); Van Dyke v. S.K.I., Ltd., 67 Cal. App. 4th 1310, 1316-17 (1998) (ski operator had heightened duty to plaintiff skier by placing a metal sign in the ski run

"where is was virtually invisible to skiers" crossing from a certain side); Danieley v. Goldmine Ski Associates, Inc., 218 Cal. App. 3d 111, 122 (1990) (reviewing California cases and stating the rule that a ski operator has not assumed a heightened duty where the man-made structure was "obvious, necessary, or inherent in the sport"); Randall, 63 F. Supp. 2d at 1254 (placement of artificial snow walls on a ski slope, which were not obvious or well-marked created a heightened duty of defendant to plaintiff skier); see also Connelly, 39 Cal. App. 4th at 13-14 (observing that the ski lift pole that injured plaintiff was observeable from all angles). An adequate notice is one that is plainly visible from all angles. See, e.g., Souza, 138 Cal. App. 4th at 268; Van Dyke, 67 Cal. App. 4th at 1316-17; Connelly, 39 Cal. App. 4th at 13-14. In making this determination, courts have considered the location of the notice, from what distance it was visible, and the size of the notice. See id.

Here, defendant has not established as a matter of law that its warnings at the entrance to and throughout the terrain park were sufficient such that plaintiff assumed the terrain park's risks as a matter of law. Although neither party disputes that there were signs at the entrance of the terrain park, there has been minimal evidence tendered regarding the signs. Specifically, defendant has only tendered four photographs as evidence of the notice it provides of a skier's entry into the terrain park. Tanzer Decl. Ex. A (photographs numbered 1.17-1.20). One of these photographs depicts the three signs that are grouped together and

apparently comprise defendant's notice to skiers that they are entering the terrain park. Id. Ex. A (photograph 1.17). It is not possible to discern from this evidence the size of these signs nor from what directions and distance they are visible. See id. The remaining three photographs depict each of the three signs. Id. Ex. A (photograph 1.18-1.20). The contents of the signs are similar. Each sign lists some of the features present in the terrain park. Id. Two of the signs have "STOP READ THIS!" and "FREESTYLE SKILLS REQUIRED" written at the top. Id. They list the features that the site "may" contain, including "half pipes." Id. The third sign's contents are more minimal, but appears to be written in a larger font and states, among other things, "Medium to Large Half Pipe." Id. None of the signs appear to contain a map of the terrain park or otherwise appear to indicate where in the terrain park certain features are located. See id.

Given the factual considerations on which California courts have relied when determining whether a notice of exceptional features in a ski terrain was adequate, the court cannot conclude that defendant has shown that its notice was adequate as a matter of law. See Souza, 138 Cal. App. 4th at 268; Van Dyke, 67 Cal. App. 4th at 1316-17; Connelly, 39 Cal. App. 4th at 13-14. Particularly compelling is the fact that defendant has tendered no evidence of the size of the signs and their location vis-a-vis skiers, as this elements is essential to determining whether a warning is adequate. See id.

////

**3.   Plaintiff's Actual Knowledge of the Risks of the Terrain Park**

Nevertheless, defendant urges the court to find that it need not determine whether the signs were adequate as a matter of law because the plaintiff entered the terrain park knowingly. The court cannot agree. Mr. Madhusudanan, the plaintiff's companion, testified in his deposition that he and plaintiff intended to enter the terrain park as a route to a different ski run. See Penwarden Decl. Ex. F at 31:2-4, 39:10-40:17. He testified that he skied past the signs at the entrance of the terrain park and saw them, but did not stop to read them. Id. at 39:10-40:7. Mr. Madhusudanan testified that he was aware that the signs generally said that there were man-made elements in the park and that "specific skills" are needed to use those features. Id. at 40:22-41:6. From this, defendant argues, the court must infer that plaintiff had similar actual knowledge of the warnings contained in the signs.

The court is not persuaded. The evidence that defendant itself has tendered establishes that plaintiff did not stop to read the signs at the entry of the terrain park. See id. at 39:10-40:17. There has been no evidence tendered that plaintiff had previously encountered terrain parks or would be otherwise aware of the notices provided in the signs, although plaintiff has admitted that he was an "advanced skier" at the time of the incident. See Pl.'s Response to Def.'s Separate Statement of Undisputed Material Facts ¶ 3.

In cases where a plaintiff has been held to have assumed a

risk based on his own actual knowledge of the hazard at issue, there has been evidence establishing such knowledge. For example, in O'Donoghue v. Bear Mountain Ski Resort, 30 Cal. App. 4th 188 (1994), the court held that plaintiff had assumed the risk of skiing on more dangerous terrain based on his actual knowledge of the hazards there. There, plaintiff was injured when he skied into a gap of trees in an effort to reach another run and fell onto boulders. Id. at 191. The court upheld a grant of summary judgment for the defendant resort, holding that plaintiff had assumed the risk of his activities. Id. at 193. The court held that the plaintiff had purposefully skied on the run, which he had skied before, and "deliberately went off the trail into the naturally forested area." Id. at 193. Accordingly, he saw the hazard he was entering (a "natural forest") and knowingly entered it, thereby assuming the risks of its hazards. Id.

This approach is consistent with the assumption of risk rule applied in California, which has as an essential element that the plaintiff's participation in the hazardous activity represented a "voluntarily decision." Knight, 3 Cal. 4th at 314. A jury could draw the inference that the plaintiff entered the terrain park knowing of the risks described in the defendant's signs, however this inference is not compelled from the facts tendered. As such, defendant has not shown that as a matter of law plaintiff's knowledge of the risks of the terrain park demonstrate that he assumed those risks. Defendant's motion must be denied on these grounds.

**4.  Plaintiff's Assumption of the Risks of Every Hazard in
      the Terrain Park**

Even if the court were to find that as a matter of law plaintiff assumed the risks of skiing in a terrain park, it remains disputed whether defendant had a duty to not increase the risks associated with this specialized type of skiing. In other words, plaintiff contends that even if he knowingly entered the terrain park, defendant increased the inherent risks of it by failing to provide adequate notice of the halfpipe within the park.

Although no California case has addressed this question in the context of terrain park skiing, analogous cases indicate that the defendant has a duty not to increase the risks of a specialized version of a sport, even if the participant has knowingly engaged in that subtype of the sport. The California Court of Appeals reached this conclusion in a case involving snowboard jumping. Vine v. Bear Valley Ski Co., 118 Cal. App. 4th 577 (2004). There, plaintiff was an employee of the defendant ski resort, who had modified an existing snowboard jump for an employee party. Id. at 583. Plaintiff was injured when she attempted the jump and she sued, alleging that defendant had increased the inherent risk of the jump. Id. The jury found in her favor. Id.

On appeal, the court considered whether the trial court erred in its instructions regarding assumption of risk and whether instruction on contributory negligence was proper. It held that the jury should not have been instructed that plaintiff could be found contributorily negligent for her decision to perform the jump, but

rather that decision implicated her assumption of the risk of participating in the sport of snowboard jumping. Id. at 596. The court reviewed <u>Knight</u> and other similar cases to determine by what standard defendant's liability should have been considered. Id. at 596-98. It concluded, "The jury should have considered not whether an ordinarily prudent person in Bear Valley's position would have anticipated that someone might be injured on the jump, but what steps Bear Valley should reasonably have taken to minimize the risks without altering the sport of snowboard jumping." Id. at 597-98. The trial court erred, it held, by not instructing the jury to this effect. Id. at 598. This approach reflects that taken by other California courts when considering assumption of risk for a particularly dangerous subtype of a sport. See, e.g., <u>Bronco v. Kearny Moto Park, Inc.</u>, 37 Cal. App. 4th 184 (1995) (bicycle rider did not assume the risk of a negligently designed jump in a "moto park," although rider had knowingly entered the moto park and used the jumps).[5]

Here, plaintiff has tendered some evidence to show that, even if he assumed the risks of the hazards of the terrain park, defendant increased the inherent risks of terrain park skiing by

---

[5]Defendant's reliance on <u>Shukoski v. Indianhead Mountain Resort, Inc.</u>, 166 F.3d 848 (6th Cir. 1999), is not persuasive. There, the Sixth Circuit held that under a Michigan statute, a skier accepts the dangers that are inherent, obvious, and necessary to the sport. Id. at 853, citing Mich. Comp. Laws § 408.342(2). Accordingly, it concluded that a skier in a terrain park is deemed to have assumed the risks of all of the hazards in the park. Id. As the California Court of Appeals observed in <u>Vine</u>, when distinguishing <u>Shukoski</u>, the Michigan statute does not reflect the California assumption of risk doctrine. <u>Vine</u>, 118 Cal. App. 4th at 592 n. 3.

failing to properly mark or restrict entry into the halfpipe. Plaintiff has tendered evidence that he and his companion entered the halfpipe from the side. Pl.'s SUF ¶ 38. He has tendered evidence that, from that direction, there were no signs or markings indicating that the halfpipe was there. Id. ¶¶ 38, 53. Moreover, although the defendant has tendered evidence showing ropes and poles around the half-pipe, plaintiff has tendered evidence that these features were not present at the time of his accident. Pl.'s SUF ¶¶ 5, 33, 49, 51, 53. Defendant therefore has not established that its notice provided about the hazards of the terrain park generally or the half-pipe specifically were adequate as a matter of law. See Solis, 94 Cal. App. 4th 354; Vine, 118 Cal. App. 4th at 597-98. Consistent with the Vine court's holding, it will be the duty of the factfinder to determine "what steps [the defendant] should reasonably have taken to minimize the risks without altering the sport" of terrain park skiing. See Vine, 118 Cal. App. 4th at 597-98. Defendant's motion for summary judgment must be denied.[6]

_____

[6]Plaintiff puts a great deal of emphasis on evidence that tends to show that defendant's construction of and warnings regarding the terrain park fell below industry custom. Although in some circumstances, evidence regarding the nature of the sport is admissible on the assumption of risk question, these circumstances include only limited instances where the court has little general knowledge of the nature of the sport in question. See Staten v. Superior Court, 45 Cal. App. 4th 1628, 1634-1637 (1996). Here, such evidence is unnecessary because, as stated above, in the skiing context the rule is clear that the defendant must show that it did not create a heightened duty to the plaintiff skier because the hazard encountered was naturally occurring, inherent in the sport of skiing, or obvious to a skier. See, e.g., Knight, 3 Cal. 4th at 315-16; Connelly, 39 Cal. App. 4th at 13-14; O'Donoghue, 30 Cal. App. 4th at 192-193. The California rule is also clear that even

**B.    Motion to Bifurcate**

Defendant moves to bifurcate the trial into liability and damages phases, arguing that it is warranted to promote judicial economy and convenience of witnesses and to minimize prejudice to the defendant. Plaintiff opposes.

Under Rule 42(b), bifurcation of a trial into liability and damages phases may be appropriate where doing so would be economical and efficient, and where there is little overlap in the evidence that would be presented at each phase. Arthur Young & Co. v. U.S. Dist. Court (Kaufman), 549 F.2d 686, 697 (9th Cir. 1979); see also Green, 226 F.R.D. at 633-34 (bifurcation not proper where the issues defendant sought to have resolved in separate phases had significant factual overlap, notwithstanding that a unified trial would with "little doubt" prejudice the defendant). Bifurcation may also be appropriate where a single trial may be unfairly prejudicial to one of the parties. Fed. R. Civ. P. 42(b); see also Tri-R Sys. v. Friedman & Son, 94 F.R.D. 726, 727 (D. Colo. 1982) ("[T]he mere possibility of some prejudice does not justify separate trials where such prejudice is not substantial and there are strong countervailing considerations of economy.").

Due to the nature of the claim, the evidence tendered

---

if a plaintiff participates in a particularly risky subtype of a sport, the defendant assumes a duty to the plaintiff by increasing the risks inherent to that subtype. See, e.g., Vine, 118 Cal. App. 4th at 597-98; Bronco, 37 Cal. App. 4th at 184. Instead, much of plaintiff's evidence describing industry cutsom appears relevant for the question of whether defendant breached its duty to the plaintiff.

regarding liability will address the conditions of the ski area and plaintiff's decision to ski there. The evidence regarding damages will address the extent and nature of plaintiff's injuries. There is, therefore, little if any factual overlap between the evidence offered on these two issues that would render bifurcation confusing to the jury or unduly repetitive.

Plaintiff contends that evidence regarding the extent of his injuries should be presented prior to his presentation on liability in order for the jury to properly weigh plaintiff's testimony. The parties do not dispute that one of the defense theories on the issue of liability is that plaintiff purposefully or unintentionally skied into the terrain park area. Due to his injuries, however, plaintiff is unable to recall what occurred immediately prior to his injury. Plaintiff contends that the jury will need to understand the extent of plaintiff's injuries in order not to discredit his assertions that he is unable to recall what he did prior to the accident. This concern does not weigh strongly in favor of a unified trial. As described in more detail below, the parties intend to present several hours' worth of evidence on the precise nature, extent, and future ramifications of plaintiff's injury. Such extensive evidence is not necessary to enlighten a jury on why plaintiff's testimony about the events on the day of his injury may appear incomplete. As defendant suggests, that could be accomplished simply by the court informing the jury that it is undisputed that plaintiff suffered a brain injury and consequently has no memory of the events

surrounding the accident.

Nevertheless, simply because the issues in the case are severable does not mean that the court must bifurcate the trial. See, e.g., United Air Lines, Inc. v. Weiner, 286 F.2d 302, 306 (9th Cir. 19610 (it is a case by case determination whether, in a negligence action, the issues of liability and damages should be tried separately). Whether a unified trial would prejudice a party must also be considered in determining whether bifurcation is proper. Fed. R. Civ. P. 42(b). Defendant argues that bifurcation would avoid prejudice that would result on the liability issue from the jury hearing evidence on the extent and nature of plaintiff's injuries. The possibility of this type of prejudice militates in favor of bifurcation. See, e.g., Moss v. Assoc. Trans., Inc., 344 F.2d 23, 25-26 (6th Cir. 1965); Beeck v. Aquaslide N Dive Corp., 562 F.2d 537, 542 (8th Cir. 1977). The danger of this prejudice, however, may be mitigated by instructing the jury not to allow sympathy to influence the verdict. See CACI 100; BAJI 1.00. Moreover, plaintiff has offered some evidence to suggest that bifurcation would unfairly prejudice him, as it would provide an incentive to the jury to return a verdict favorable to defendant on the issue of liability in order to avoid the burden of returning for jury service to determine damages. See Hamm v. American Home Properties Corp., 888 F. Supp. 1037 (E.D. Cal. 1995); 9 Wright and Miller, Fed. Practice & Proc. Civil 2d § 2390 (concluding that the success rate for plaintiffs on personal injury claims in bifurcated

trials is so low as to suggest "a substantial change in the nature of the jury trial itself," beyond simply the removal of unfair prejudice). Particularly given the uncertainty as to whether savings in efficiency and economy would be made by bifurcation, as discussed below, the prejudice identified by defendant does not appear so great as to merit bifurcation.

The court next considers whether bifurcation would conserve trial time. The parties represented at the time of the Scheduling Conference that trial would take approximately twelve days. Order, Jan. 31, 2008, at 9. The parties do not now dispute this estimate; in fact, plaintiff has confirmed that it remains accurate. Decl. of Peter Bersin In Support of Opp'n to Mot. to Bifurcate ("Bersin Decl.") ¶ 10. Plaintiff has identified two percipient witnesses, including plaintiff himself, and two expert witnesses to testify as to liability. See Decl. of Jill Haley Penwarden In Support of Mot. to Bifurcate ("Penwarden Decl.") ¶¶ 3, 5 & Exh. A, C; Bersin Decl. ¶ 7. Defendant indicates that it intends to call four to five percipient witnesses and three experts to testify on liability. Mot. to Bifurcate at 3-4; Penwarden Decl. ¶ 6 & Exh. D. Plaintiff's counsel estimates that this evidence will constitute "60% to 70% of the trial time," or, in other words, approximately 7-8.5 days of the trial. Opp'n to Mot. to Bifurcate at 12. Defendant has not offered any estimate of the total trial time presentation of the liability witnesses.

Defendant points out that many more witnesses have been identified to testify as to damages. Defendant intends to call

all eighteen of plaintiff's treating physicians.[7] Penwarden Decl. ¶ 6 & Exh. D; Mot. to Bifurcate at 3. Defendant also intends to call five expert witnesses to testify on the issue of damages. Id. In his disclosures, plaintiff identified five expert witnesses, fifteen non-expert witnesses, and his treating physicians as possible witnesses as to damages. See Penwarden Decl. ¶¶ 3, 5 & Exh. A, C. In his opposition to defendant's motion, however, plaintiff indicated that he intends to call all of his identified experts, at most two of the treating physicians, plaintiff and two to four non-expert witnesses who are family members and friends of the plaintiff. Bersin Decl. ¶ 4; Opp'n to Mot. to Bifurcate at 7. Plaintiff opines that the medical testimony may be completed in 6 to 8 hours, as there appears to him no dispute among the experts as to plaintiff's "diagnosis and his prognosis." Bersin Decl. ¶ 2; Opp'n to Mot. to Bifurcate at 7. He expects that the testimony regarding future medical care costs, loss of earnings, and life care costs can be presented by two expert witnesses in 4 to 6 hours. Opp'n to Mot. to Bifurcate at 7. Defendant disputes these estimates of trial time as overly conservative, identifying discrepancies among the experts as to the cost of plaintiff's future medical care and loss of earnings and possible inaccuracy in plaintiff's experts' opinions, which would need to be developed on cross-examination.

---

[7] It is unclear whether defendant in fact intends to call these witnesses if plaintiff does not. In its reply brief, defendant appears to expect that these witnesses would not testify if plaintiff does not choose to call them. See Reply In Support of Mot. to Bifurcate at 2.

Reply In Support of Mot. to Bifurcate at 3; Reply Decl. of Jill Haley Penwarden In Support of Mot. to Bifurcate ¶¶ 2-3. Defendant has not, however, offered an estimate of the time it anticipates will be necessary to cross-examine plaintiff's experts.

It appears, therefore, that there will be 13-17 witnesses called to testify on the issue of damages, assuming that none or few of plaintiff's treating physicians are called.[8] Given plaintiff's representation of the degree of consensus on some of the issues relevant to damages and defendant's identification of only two major areas of cross-examination of experts, it does not seem unreasonable to believe accurate plaintiff's estimates of the trial time testimony from these witnesses will comprise. It is admittedly difficult, however, to make this determination without a precise indication of how many witnesses will be called. Defendant has indicated that it intends to call all five of its damages experts but apparently has abandoned its previous intention to call any of plaintiff's treating physicians. See Reply in Support of Mot. to Bifurcate at 2. Plaintiff has narrowed the range of possible witnesses he intends to call, but he indicates he could call as few as eight or as many as twelve. Bersin Decl. ¶ 4; Opp'n to Mot. to Bifurcate at 7. Due to this uncertainty in the number of witnesses who will be called on the issue of damages, the court cannot conclude at this time that expedition, economy, or convenience are served by bifurcating the trial. See Fed. R. Civ. P. 42(b). Nonetheless, the fact that

---

[8] See note 5, *supra*.

bifurcation apparently significantly alters the dynamics of trial, weighs heavily against bifurcation. In any event, the motion is denied without prejudice.

**V. CONCLUSION**

For the reasons stated herein, the court ORDERS as follows:

1.  Defendant's motion for summary judgment is DENIED.

2.  Defendant's motion to bifurcate is DENIED, without
    prejudice.

IT IS SO ORDERED.

DATED: April 3, 2009.


_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT